IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:00-CR-293-5 |
| | ) | |
| RICO MALLARD CRUMP, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The defendant-inmate, Rico Crump, has filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A), asking the Court to reduce his sentence. Mr. Crump has shown extraordinary and compelling circumstances. But when those circumstances are considered in light of the § 3553(a) factors, a sentence reduction is not warranted. His motion will be denied.

I. OVERVIEW

In 2000, Mr. Crump pled guilty to drug and firearm charges arising out of his role in a robbery during a drug deal. He received a 310-month sentence, comprised of 190 months for possession with intent to distribute cocaine hydrochloride and a mandatory-minimum consecutive sentence of 120 months for discharging a firearm in connection with a drug trafficking offense.

Mr. Crump has now served 20 years, over 80% of his sentence, and asks that his sentence be reduced under § 3582(c)(1)(A). He contends that the conditions at USP Allenwood, where he is housed, combined with his chronic medical conditions and the

COVID-19 pandemic constitute extraordinary and compelling circumstances warranting a sentence reduction.  Doc. 404 at 2–4; Doc. 405.[1]

## II. PROCEDURAL HISTORY

As a result of the drug deal and robbery, a grand jury returned a seventeen-count superseding indictment against Mr. Crump and his nine co-defendants.  Four counts contained charges against Mr. Crump.  Doc. 355-1.  Count One alleged a conspiracy to distribute cocaine base and conspiracy to possess cocaine hydrochloride with the intent to manufacture cocaine base.  Count Two alleged possession with intent to distribute cocaine hydrochloride on June 6, 2000.  Count Eight alleged possession of a firearm by a felon and Count Nine alleged carrying and using, by discharging, a firearm in furtherance of a drug trafficking crime on June 6, 2000, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).[2]  Doc. 401 at ¶¶ 2–3; Doc. 355-1 at 5.[3]

On November 22, 2000, Mr. Crump pled guilty to Counts Two and Nine.  Minute Entry 11/22/2000; Doc. 355-2.  In return for the government's agreement to dismiss the other charges, Mr. Crump agreed to significantly limit his right to appeal or challenge his convictions or sentences in post-conviction proceeding.  Doc. 355-2 at ¶ 5(f).

---

[1] All doc cites refer to the docket in Case No. 1:00-CR-293.

[2] The plea agreement reflects that the statutory minimum penalty for § 924(c)(1)(A)(iii) is ten years, which may not run concurrently to any other sentence.  Doc. 355-2 at p. 2 ¶ 2(b).

[3] Mr. Crump's case is old, and the original pleadings from 2000-2001 are not available on the electronic docket. The government filed copies of the superseding indictment and plea agreement with its motion to dismiss a § 2255 petition at Docket 355. The Court has examined the paper file and these filed copies, which are identical to the originals in the paper file. For convenience, the court will reference these pleadings by the docket number and page number electronically appended by the CM-ECF system.

In 2001, when Mr. Crump was sentenced, the judge was required to impose a sentence within the range established by the guidelines. *See United States v. Booker*, 543 U.S. 220, 245 (2005). At the hearing, the court adopted the presentence report, *see* Doc. 406, and determined that a bottom-of-the-guidelines, *see* Doc. 401 at ¶ 68, sentence of 190 months for the drug conviction was appropriate, followed by the mandatory minimum consecutive 120-month sentence for the firearm offense, followed by five years of supervised release. Minute Entry 04/04/2001; *see* Doc. 374 at 1–2.[4]

In January 2014, Mr. Crump filed a motion to vacate his sentence based on a change in the law, Doc. 348, which the Court denied because it was untimely and because the change in the law did not apply and was not retroactive to cases on collateral review. Doc. 374 at 3–4.[5] In February 2020, Mr. Crump filed a motion under 18 U.S.C. § 3582(c)(2), asking the Court to reduce his sentence based on U.S.S.G. § 2D1.1(c), amend. 782, which retroactively reduced base offense levels for certain drug offenses. Doc. 400. Because Mr. Crump's guideline range was based on his career offender status, not the drug amount, the Court denied his motion. Doc. 403; *see* Doc. 402.

On January 29, 2021, Mr. Crump filed the pending motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A). Doc. 404. As noted *supra*, he asserts that the conditions of confinement at the facility where he is housed combined with his

---

[4] The sentencing judge has retired, and the case has been reassigned to the undersigned.

[5] Mr. Crump contended that under *Alleyne v. United States*, 570 U.S. 99, 107 (2013), his conviction for discharging a firearm (Count Nine) should be set aside because a jury did not find that he discharged the firearm. Doc. 348 at 2–3.

3

chronic medical conditions and the COVID-19 pandemic constitute extraordinary and compelling circumstances for a sentence reduction. Doc. 404 at 2–4; Doc. 405. The Court appointed counsel, Doc. 409, and the motion is now ripe for review.

### III. FACTS

For purposes of this motion and based on its evaluation and weighing of the evidence presented, the Court finds the following facts.

#### A. Offense Conduct, Criminal Record, and Co-Defendant Information

Mr. Crump was 24 years old when he committed the offenses for which he is incarcerated. *See* Doc. 401 at 2, p. 6 ¶ 18. Before these offenses and despite his relative youth, he had accumulated a significant criminal history. Mr. Crump had convictions for assaults, *id.* at ¶ 41, injury to personal property, *id.* at ¶ 42, possession with intent to sell and deliver cocaine and sale and delivery of cocaine, *id.* at ¶ 43, animal control misdemeanors, *id.* at ¶ 44, second degree trespassing, *id.* at ¶ 45, and indecent liberties with a child. *Id.* at ¶ 46. He had served several short sentences in custody, *id.* at ¶¶ 41, 42, 44, the longest of which appears to have been about four years. *Id.* ¶ 43. Mr. Crump was released from prison in May 1999 and his parole ended in August 1999. *Id.*

In June 2000, Mr. Crump committed the crimes that led to the sentences here. Specifically, he participated in an armed robbery with his older brother, Martinus Crump, and several others. The group planned to rob two men who had offered to sell several kilograms of cocaine hydrochloride to co-defendant Cole. *Id.* at ¶ 18. They agreed to steal and split the drugs. *Id.*

Co-defendant Cole, who had a relationship with the suppliers, arranged to meet the dealers at his apartment on June 6, 2000. *Id.* at ¶¶ 18. Mr. Crump and eight other co-conspirators rode to Cole's apartment in a Ford Excursion. *Id.* On their way, the group made two stops so Mr. Crump and his brother could retrieve firearms. *Id.* Martinus Crump then handed out assignments for the robbery: co-defendant Lawrence would enter the apartment and act as the "money man" to buy the drugs; Martinus Crump and Mr. Crump would follow with their handguns and take the drugs; co-defendants Lumpkin and Brooks would come in, obtain guns in the apartment, and assist; co-defendants Hearne, Swaringen, and Pemberton would remain in the car with an SKS assault rifle; and co-defendant Ellis would be in the driver's seat, ready as the getaway driver. *Id.*

The group arrived at the apartment and began to execute their plan, but the robbery quickly went wrong. After the dealers put the drugs—almost two kilograms of cocaine hydrochloride—on the kitchen table, co-defendants Brooks and Lumpkin approached with shotguns. *Id.* at ¶ 22. One of the dealers grabbed co-defendant Brooks' gun and the gun fired, Mr. Crump and his brother pulled their handguns out, and both dealers were shot, though the presentence report does not make it clear by whom. *Id.* According to the superseding indictment and the various plea agreements, co-defendant Brooks and Mr. Crump discharged their firearms, Martinus Crump brandished his firearm, and co-defendant Lumpkin carried a firearm.[6]

---

[6] Mr. Crump and co-defendant Brooks were each convicted of discharging a firearm in furtherance of a drug trafficking crime in violation of 21 U.S.C. § 924(c)(1)(A)(iii) and each received the mandatory consecutive sentence of 10 years. *See* Doc. 355-1 at 5–6 (Counts Nine

5

The dealers' friends, who were waiting outside, heard the gunfire and fired their weapons at the Ford Excursion. *Id.* at ¶ 23. The dealers and their friends then quickly left. *Id.* Mr. Crump and all other co-defendants except co-defendant Cole also fled; they took the drugs and guns with them but abandoned them a short distance away. *Id.* at ¶¶ 23–24. Some of the co-defendants were arrested shortly after, *id.* at ¶ 23, and one led the officers to the drugs and guns. *Id.* at ¶ 24.

Mr. Crump was arrested on June 6, 2000. *Id.* at 1. He has since been in custody.

At his sentencing hearing, the court found Mr. Crump to be a career offender based on prior convictions for assault inflicting serious injury, possession with intent to deliver cocaine, and indecent liberties. *Id.* at ¶ 37. This increased his base offense level from 26 to 37, *id.* at ¶¶ 36–37; his criminal history category was VI even without the enhancement. *Id.* at ¶ 49. His guideline range was 188 to 235 months for the drug offense in addition to the ten-year mandatory minimum sentence for the firearm charge. *Id.* at ¶ 68. As previously noted, he was sentenced at the low end of the guidelines for the drug offense, receiving a total sentence of 310 months in prison. *See* Doc. 374 at 1–2.

From the presentence report, it appears that co-defendants Cole and Martinus Crump—released in February 2013 and April 2020—were the ringleaders. *See, e.g.*,

---

and Eleven); Doc. 355-2 at ¶ 2(b); Doc. 341. Martinus Crump was convicted of brandishing a firearm in furtherance of a drug trafficking crime in violation of § 924(c)(1)(A)(ii) and received the mandatory consecutive sentence of seven years. *See* Doc. 355-1 at 9 (Count Sixteen); Doc. 166. And co-defendants Lumpkin and Hearne were both convicted of carrying a firearm in furtherance of a drug trafficking crime in violation of § 924(c)(1)(A)(i) and each received the mandatory consecutive sentence of five years. *See* Doc. 355-1 at 4, 9 (Counts Seven and Seventeen); Docs. 157, 163.

6

Doc. 401 at ¶ 18 ("Cole discussed with the other[s] plans to stage a robbery at his residence. Cole indicated to the others that he would contact Navarra and Hernandez to get them at his residence with the drugs."); *id.* at ¶ 38 ("On the way to Cole's residence, Cole called numerous times on a cell phone and talked to Martinus Crump. Martinus Crump directed everyone as to their duty during the robbery."); *id.* at ¶ 16 (noting that Martinus Crump paid for the rental used as the getaway car). Co-defendants Ellis, Hearne, Swaringen, and Pemberton—all released on or before July 2015—remained in the car and never fired the assault rifle that was in the Excursion. *Id.* at ¶ 23.

Mr. Crump and his co-defendants were each charged with: (1) conspiracy to distribute cocaine base and conspiracy to possess cocaine hydrochloride with the intent to manufacture cocaine base; and (2) unlawfully possessing with the intent to distribute cocaine hydrochloride. Doc. 355-1 at 1–2. Each defendant was also charged with various offenses arising out of their possession or use of a firearm during the drug deal/robbery. *See generally id.* All co-defendants but Brooks and Pemberton pled guilty to possession with intent to distribute cocaine.[7] All but co-defendant Ellis, the getaway driver, pled guilty to possession of a firearm in furtherance of a drug trafficking crime in violation of § 924(c); the mandatory consecutive sentences imposed varied depending on whether the defendant carried, brandished, or discharged the firearm. *See supra* note 6.

---

[7]As with Mr. Crump's case, the original pleadings are not available on the electronic docket for many of his co-defendants. The Court has examined the minute entries summarizing the records and, where available, the electronic records to determine what charges each defendant pled guilty to and the sentences imposed for their convictions.

7

Co-defendant Cole's initial sentence on the drug charge was lower than Mr. Crump's for reasons allowed by the guidelines, and it was later reduced due to a retroactive change in the guidelines as to the drug amount; Mr. Crump was not eligible for that reduction because his guideline was based on his career offender status. *See* Doc. 403. And Martinus Crump's total sentence was shorter than his brother's because he received a seven-year consecutive sentence for brandishing a firearm rather than the ten-year sentence for discharging a firearm during a drug trafficking offense. Since Martinus Crump was also a career offender, his sentence on the drug charge was nearly identical to his brother's sentence for the drug conviction. In sum, although all of Mr. Crump's co-defendants have now been released from custody,[8] the defendants were charged and sentenced consistently with variations based primarily on differences in criminal histories, whether the defendant carried, brandished, or discharged a firearm during the robbery, and other relevant factors set forth in the guidelines.

**B. Post-Conviction Conduct and Proposed Release Plan**

In the two decades that Mr. Crump has been incarcerated, he has completed some 50 educational courses and maintained employment in various prison work assignments.

---

[8] *See* Doc. 199 (co-defendant Ellis was released on 11/14/2003); Doc. 201 (co-defendant Pemberton was released 11/29/2004); Doc. 261 (co-defendant Lawrence was released on 09/19/2005); Doc. 251 (co-defendant Swaringen was released 2/20/2009); *see* Doc. 291 (co-defendant Lumpkin was released on 9/07/2010); Doc. 308 at 1 (co-defendant Hearne was released 08/09/2011); *see Find an inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Apr. 14, 2021); (co-defendant Cole was released on 2/25/2013); Doc. 345 (co-defendant Brooks was released on 4/5/2013); *see Find an inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Apr. 14, 2021) (co-defendant Martinus Crump was released 04/28/2020).

Doc. 410 at 5–7. Mr. Crump has received approximately 25 disciplinary sanctions, several of which occurred in the last two years. *Id.* at 1–4. Many are for "phone abuse-disrupt monitoring;" others are for possessing unauthorized items or dangerous weapons and for fighting with or assaulting other persons. *Id.*[9] His most recent disciplinary sanction was in October 2020 for disruptive conduct. *Id.* at 1.[10] And in June 2019, he was sanctioned for introducing drugs or alcohol into the facility. *Id.*; Doc. 411-6 at 1. He has lost hundreds of days of good time credit for violating prison rules. Doc. 411-6.

If released, Mr. Crump plans to live with his sister, niece, and great-nephew in Albemarle, North Carolina. Doc. 410 at 7. His family assisted Martinus Crump when he was released from prison in April 2020, and they are willing to help Mr. Crump during his transition home. *Id.*; Doc. 418-3; Doc. 408.

Mr. Crump has two children who live in North Carolina with whom he communicates regularly. Doc. 418-2 at ¶ 9. His fiancée, Temeka Davis, also lives in North Carolina and is willing to add Mr. Crump to her health insurance plan. Doc. 407; Doc. 418-2 at ¶ 14. Finally, Mr. Crump has a job waiting for him with a tree service upon release. Doc. 418-4. The probation office tentatively approved his release plan,

---

[9] Mr. Crump admitted to committing several of the infractions, but he denied others. *See, e.g.*, Doc. 411-6 at 5. (noting Mr. Crump "denied fighting" and stated that he "was only defending himself.").

[10] According to Mr. Crump, this infraction "resulted from his use of another inmate's phone to communicate with his family" after the BOP revoked all his communication privileges in June 2019 for another contested offense. Doc. 418-2 at ¶ 11; Doc. 418 at 10.

9

subject to the addition of a requirement for warrantless searches for contraband such as drugs and guns. Doc. 410 at 7.

### C. Mr. Crump's Medical Conditions and the Conditions at USP Allenwood

In November 2017, Mr. Crump was diagnosed with Hodgkin's lymphoma and underwent four cycles of chemotherapy treatment between February 2018 and May 2018. Doc. 405; *see* Doc. 412 at 11, 149. The CDC reports that adults currently suffering from cancer are at an increased risk of severe illness from COVID-19, but it is not yet known whether having a history of cancer increases the risk of severe illness. *See People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Apr. 14, 2021). Mr. Crump's BOP chart states that he has been in remission since July 2018, Doc. 405 at 1, but radiology reports from December 2018, December 2019, and August 2020 reflect ongoing concerns. Doc. 418-1; Doc. 412 at 91, 149.

A lay review of his medical records indicates that Mr. Crump is not "cured" of his cancer, and regular scans have been ordered to see if further treatment is necessary. As best the Court can tell, all ordered scans have been conducted and no treatment beyond continued monitoring is outstanding. *See, e.g.*, Doc. 412 at 7, 82–86, 91. The BOP is adequately monitoring his cancer despite the pandemic.

Mr. Crump also suffers from sarcoidosis, prediabetes, gastro-esophageal reflux disease without esophagitis, and vitamin D deficiency, *id.* at 48, all of which the BOP is treating. *See, e.g.*, *id.* 412 at 2, 4, 12, 20. His prediabetes is concerning, as diabetes is a

10

well-known risk factor for severe illness from COVID-19. And there is some evidence that sarcoidosis also increases the risk of severe illness from COVID-19. Doc. 418 at 3.

Mr. Crump is presently housed at USP Allenwood. Doc. 404 at 1. BOP personnel have rotated between the facilities at Allenwood without wearing masks, the BOP has not consistently provided inmates with hand sanitizer, and during the significant outbreak in November 2020, some COVID-positive inmates were not quarantined from other inmates. *Id.* at 3; Doc. 418 at 7–8; Doc. 418-2 at ¶ 6.

Consistent with these poor practices, about 25% of the 498 inmates housed at USP Allenwood have tested positive for COVID-19 and one has died. *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Apr. 14, 2021); *USP Allenwood*, FED. BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/alp/ (last visited Apr. 14, 2021). The prison currently reports that two staff members are positive with COVID-19 and that 130 inmates and 32 staff members have "recovered." *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Apr. 14, 2021).

USP Allenwood is one of three facilities at the Allenwood federal correctional complex, which houses approximately 2,250 inmates total. *See* FED. BUREAU OF PRISONS, https://www.bop.gov/locations (last visited Apr. 14, 2021). Currently, the BOP reports that 981 inmates and 394 staff members at the Allenwood federal correctional complex have been vaccinated. *See COVID-19 Vaccine Implementation*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Apr. 14, 2021). While this matter was under consideration, the number of vaccinated inmates increased

11

significantly. It is not clear how many of the 981 vaccinated inmates are housed at USP Allenwood. *See* Doc. 411 at 14 n.5. There is no evidence to show whether Mr. Crump has been vaccinated or even offered the vaccination. As the government could have presented this evidence if he has, the Court finds for purposes of this motion that Mr. Crump has not been offered the vaccination as of yet.

Early in November 2020, Mr. Crump tested positive for COVID-19. Doc. 412 at 49.[11] He was placed in isolation for much of the month. *Id.* at 43 (noting that Mr. Crump was released from isolation on 12/2/2020); Doc. 405 at 3 (undated letter to Mr. Crump notifying him that his "recent COVID-10 test was positive," he would be placed in isolation, and he would only be released from isolation after a negative COVID-19 test).

BOP medical personnel performed daily temperature checks from November 10 through November 28. Doc. 412 at 38–39. While the notes alongside the temperature checks indicate that Mr. Crump was asymptomatic, Mr. Crump credibly reports that he experienced several of the common symptoms, including chills, body aches, and coughing for several weeks. Doc. 418-2 at ¶ 3. The personnel taking his temperature refused his requests for care and denied his request for access to the commissary to buy cough syrup. *Id.* at ¶ 4. Despite his increased risk because of his cancer and his repeated requests for a medical exam because of his symptoms, the only "health care" he received

---

[11] At least from a lay perspective, the BOP medical records are confusing as to what date he tested positive. *See* Doc. 412 at 49 (listing confirmed positive date as 11/09/2020); at 51 (same); at 6 (noting that Mr. Crump needed a COVID-19 test as soon as possible on 11/23/2020); at 5 (noting that a copy of the 11/09/2020 test was printed on 11/24/2020); at 43 (noting that Mr. Crump was released from isolation on 12/2/20).

was the daily temperature checks. A physician assistant reviewed his chart in mid-January and renewed his prescriptions, Doc. 412 at 4, but the first time he saw a physician assistant for a medical assessment after testing positive for COVID-19 was February 9, 2021. *Id.* at 1–2, 47. No records show that he has seen a physician.

According to the CDC, Mr. Crump faces an undeniable risk of reinfection. "The risk of reinfection . . . depends on the likelihood of re-exposure to infectious cases of COVID-19," and "[c]ontinued widespread transmission makes it more likely that reinfections will occur." *See COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html (last visited Apr. 14, 2021). Additionally, "waning immunity and the possibility of exposure to virus variants" make the probability of reinfection increase with time after recovery from an initial infection. *Id.* Mr. Crump's risk is heightened even more by the fact that he is incarcerated in a congregate living setting. *See FAQs for Correctional and Detention Facilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (last visited Apr. 14, 2021) ("Staff and people incarcerated in correctional and detention facilities are at greater risk for . . . COVID-19 . . . .").

## IV. COMPASSIONATE RELEASE

Courts do not have unfettered jurisdiction or discretion to modify criminal sentences. *See United States v. Goodwyn*, 596 F.3d 233, 235–36 (4th Cir. 2010). A court may only modify a sentence when a provision in the Federal Rules of Criminal Procedure or a statute expressly permit it to do so. *See* 18 U.S.C. § 3582(c).

13

Section 3582(c)(1)(A), often called the "compassionate release" provision, is one such statutory provision. For a sentence reduction under § 3582(c)(1)(A) to be appropriate, the statute requires by its terms that the movant has exhausted his administrative remedies, that extraordinary and compelling reasons exist for a sentence reduction, and that the reduction is consistent with applicable policy statements issued by the Sentencing Commission. *See United States v. McCoy*, 981 F.3d 271, 275, 283 (4th Cir. 2020).[12] The Court must also consider the relevant § 3553(a) factors. *Id.* at 275.

## V. ANALYSIS & DISCUSSION

### A. Exhaustion

Mr. Crump filed this compassionate release motion after the warden at his facility denied his request for a reduction in sentence. *See* Doc. 411-1, Doc. 411-3. The government does not contest that Mr. Crump has exhausted his administrative remedies, *see* Doc. 411 at 2–3, and the Court finds that he has satisfied the exhaustion requirement.

### B. Extraordinary and Compelling Circumstances

The virus remains in circulation at USP Allenwood, and the BOP has not presented any evidence as to the protocols in place to protect vulnerable inmates like Mr. Crump. Indeed, the evidence shows BOP staff are not wearing masks, inmates have only limited ability to keep their hands clean, and the BOP has not properly segregated

---

[12] The Sentencing Commission has not yet adopted any policy statement applicable to motions filed directly by defendants. The Court has considered the old policy statement applicable to motions brought by BOP as helpful but non-binding guidance. *See United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020).

14

COVID-positive inmates from others. Doc. 418-2 at ¶ 6; Doc. 404 at 3. *See United States v. Clark*, No. 1:19-CR-152-1, 2021 WL 1254477, at *3 (M.D.N.C. Apr. 5, 2021) (noting that the government's failure to produce evidence to rebut an inmate's factual assertions about issues like bad hygiene and lack of quarantining can raise an inference that the evidence would support the defendant's factual assertions). Mr. Crump has not yet been offered the vaccine. And, as the government acknowledges, Mr. Crump's chronic conditions, particularly his Hodgkin's Lymphoma, place him at increased risk of severe illness from COVID-19. Doc. 411 at 14. That risk is more than minimal, even though he has already contracted the virus.

Based on the evidence before the Court, Mr. Crump remains at risk of severe illness from COVID-19 and this risk is serious enough to constitute extraordinary and compelling circumstances for a sentence reduction.

### C. The § 3553(a) Factors

Mr. Crump contends that the § 3553(a) factors favor release because he has served over 80% of his lengthy sentence during which he has completed coursework and maintained a close relationship with his family, he was intoxicated during the instant offense and struggled with substance abuse at the time, and all of his co-defendants have been released from prison. Doc. 418 at 8–10. According to Mr. Crump, his disciplinary sanctions, which undisputedly do not weigh in favor of release, "often involve extenuating circumstances." *Id.* at 10.

As far as the Court can tell, there are no published appellate cases that discuss whether sentencing disparities between co-defendants that develop post-sentencing are

15

appropriately considered as part of the § 3582(c)(1)(A) analysis. The Court assumes without deciding that it can and should[13] consider the disparity here despite the difficulties it presents. S*ee* 18 U.S.C. § 3553(a)(6) (listing unwarranted sentencing disparities as a factor to consider in sentencing decisions).

This does not mean, however, that the sentencing disparity favors a reduction. To weigh in favor of a reduction, a sentencing disparity must be unwarranted, and different sentences based on differing criminal records, roles in the offense, and post-offense conduct, such as cooperation, are appropriate. Courts "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007).

The Court has given careful attention to the sentencing disparity argument.[14] As the facts summarized *supra* show, the co-defendants were all initially sentenced in line with their roles in the offense, their criminal histories, and other guideline factors or authorized departures. While there have been modifications to some of the sentences over the years, those modifications were for reasons that do not apply to Mr. Crump.

For example, co-defendant Brooks, whose role in the offense was generally comparable to Mr. Crump's role, was not a career offender when originally sentenced,

---

[13] Several district courts have found it appropriate to consider post-sentencing disparities. *See, e.g.*, *United States v. Almontes*, No. 3:05-CR-58 (SRU), 2020 WL 1812713, at *9 (D. Conn. Apr. 9, 2020) (granting compassionate release and noting that due to changes in the law, the movant's "more culpable co-conspirators" had been afforded leniency while the movant had not).

[14] Mr. Crump does not contend that the sentencing disparity itself constitutes extraordinary and compelling circumstances for a sentence reduction. Assuming without deciding that such disparities may constitute extraordinary and compelling circumstances in an appropriate situation, they do not do so here for the reasons stated *infra*.

16

and his sentence was ultimately reduced after a change in the law because he did not have a prior felony conviction under federal law. *See* Doc. 325 at 2, 5 (recommending that co-defendant Brooks' sentence for possession of a firearm by a felon be vacated due to *Simmons*). Unlike Mr. Brooks, Mr. Crump had several prior felony convictions. Co-defendant Cole's sentence on the drug charge was similarly reduced based on retroactive changes to the sentencing guidelines for offenses involving crack cocaine, *see* Doc. 277, but this change did not impact Mr. Crump because his guideline range was based on his career offender status. *See* Doc. 403. His brother's sentence was shorter because his brother did not discharge a firearm. While Mr. Crump is serving a longer sentence, that is a result of his actions during the crime—discharging a firearm—and his criminal record.[15] The sentencing disparity is therefore warranted.

There are factors that weigh in favor of a reduction. Mr. Crump has maintained consistent employment in various prison work assignments. Doc. 410 at 5–7. He is 45 years old now, and the risk of recidivism is generally "inversely related to an inmate's age." *United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014). Mr. Crump has served 20 years in prison,[16] during which he has suffered serious tangential

---

[15] Mr. Crump has not argued that he would not be a career offender under the current guidelines, which were revised in 2016 to remove the "residual clause" for crimes of violence. *Dixon v. Streeval*, No. 7:19-CV-00867, 2020 WL 5910452, at *3 (W.D. Va. Oct. 6, 2020). The Sentencing Commission did not make those guideline changes retroactive. *Id.* Mr. Crump's prior record was terrible for his age, and he had not been deterred by several short prison sentences. The Court would reach the same result here regardless of his career offender status.

[16] *See United States v. Kibble*, No. 20-7009, 2021 WL 1216543, at *4 (4th Cir. Apr. 1, 2021) (holding that district courts may consider the amount of time a defendant has already served as one factor in the § 3553(a) analysis).

17

consequences; his mother, brother, and nephew died in 2020. He has a job lined up and support from family who helped his brother successfully transition home after a lengthy prison sentence. Doc. 410 at 1; Doc. 418-3; Doc. 407.

But these factors are outweighed by Mr. Crump's terrible disciplinary record. His discplinary infractions are for serious matters, including bribing prison staff, possessing dangerous weapons, violating visiting regulations, introducing drugs or alcohol into the facility, and destroying property. Doc. 410. Mr. Crump admitted to substance abuse issues in 2000 and said he was intoxicated at the time of the crimes, Doc. 401 at ¶ 63; his efforts to introduce these substances into the facility on multiple occasions indicate that his struggles with substance abuse continue to contribute to an inability to follow the rules. In sum, Mr. Crump's discplinary record shows that he is not yet ready to comply with law or restrictions that he finds inconvenient or difficult. It also undermines his claim that he is rehabilitated and will cooperate with the conditions of supervised release.

The sentencing factors overall do not favor a sentence reduction. This is especially so when they are balanced against the extraordinary and compelling circumstances here, which are real but hypothetical; he may not become re-infected and if he does, he might not become seriously ill or develop complications.

The Court concludes in its discretion that a sentence reduction is not appropriate. The motion will be denied.

It is **ORDERED** that:

1. The defendant's motion for compassionate release, Doc. 404, is **DENIED**.

18

Case 1:00-cr-00293-CCE   Document 419   Filed 04/16/21   Page 18 of 19

2. The defendant's motion to seal his reply brief, Doc. 417, is **GRANTED**, and the Clerk shall maintain the brief referencing his medical records, Doc. 418, under seal, as it contains private medical information ordinarily not made public, much of which is not relevant to this motion.

This the 16th day of April, 2021.

_____
UNITED STATES DISTRICT JUDGE